PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ZEHENTBAUER FAMILY LAND LP., *et al.*, | ) ) ) | CASE NO. 4:15CV2449 |
| Plaintiffs, | ) ) | |
| v. | ) ) | JUDGE BENITA Y. PEARSON |
| CHESAPEAKE EXPLORATION, LLC, *et al.*, | ) ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendants. | ) ) | [Resolving ECF Nos. 168, 177, and 179] |

Pending is Plaintiffs' Motion for Partial Summary Judgment (ECF No. 168) on liability

for breach of contract.[1]  Also pending is Defendant Total E&P USA, Inc.'s ("TEPUSA") Motion

for Summary Judgment (ECF No. 177).  In addition, pending is Defendants Chesapeake

Exploration, L.L.C., Chesapeake Operating, L.L.C., and CHK Utica, L.L.C.'s ("the Chesapeake

Defendants") Motion for Summary Judgment (ECF No. 179).[2]  The Court has been advised,

having reviewed the record, the parties' briefs, and the applicable law.  For the reasons that

follow, the Court agrees with Defendants' interpretation of how payment of oil and gas royalties

are to be calculated and then paid to Plaintiffs in accordance with the Gross Royalty Leases.

---

[1] Plaintiffs' motion is not accompanied by a statement certifying compliance with the Order entered on February 12, 2019.  ECF No. 142 at PageID #: 4050.

[2] Defendants Jamestown Resources, L.L.C. and Pelican Energy, L.L.C. own working interests in Plaintiffs' leases, meaning they are entitled to a certain percentage of the proceeds and are also required to pay royalties upon those proceeds.  ECF No. 15 at PageID #: 243 n. 4.  They join in the motion of the Chesapeake Defendants.  *See* ECF No. 180 and Non-document Order dated August 22, 2019.

Therefore, there is no breach of contract or breach of the express covenant to "act as a reasonable prudent operator exercising good faith."  The Court grants Defendants' motions, and denies Plaintiffs' motion.

Defendants are exploration and production companies that have contracted with landowners to drill for oil and gas on the leased properties, and Plaintiffs are a class of such landowners.  Between 2010 and 2012, Plaintiffs and Defendants entered into hundreds of oil and gas lease agreements that provide for royalty payments to Plaintiffs based on the gross proceeds received by Defendants from the sale of each well's oil and gas production.

Defendants sell the oil and gas extracted from the leased properties to so-called midstream companies affiliated with Defendants.  To calculate the price that an *unaffiliated* entity would have presumptively paid for the oil and gas, Defendants use the "netback method." That method takes a weighted average of prices at which the midstream affiliates sell the oil and gas at various downstream locations and adjusts for the midstream company's costs of compression, dehydration, treating, gathering, processing, fractionation, and transportation to move the raw oil and gas from the wellhead to downstream resale locations.  *See* Brief of Bruce M. Kramer *Amicus Curiae* in Support of Petitioner filed in *Lutz* (ECF No. 179-4) at PageID #: 5862.  The "netback price" is essentially the downstream price of the oil, gas, and natural gas liquids ("NGLs") less the post-production costs incurred to obtain that enhanced downstream price.  According to Plaintiffs, Defendants failed to tender full and complete royalty payments to Plaintiffs during the years in question because the netback method (1) does not accurately approximate an arms-length transaction price, and (2) improperly deducts post-production costs

from the price.  Defendants admit that post-production expenses were deducted before

calculating Plaintiffs' royalty payments.

## I. Stipulated Facts

The stipulated facts[3] are as follows:

1.  The oil and gas leases for the three (3) named Plaintiffs -- Zehentbauer Family Land

Limited Partnership, Hanover Farms Limited Partnership, and Robert Milton Young Revocable

Trust, dated May 14, 1998 by Evelyn Frances Young as Successor Trustee -- represent the

at-issue oil and gas lease forms for this matter.

2.  The Zehentbauer Family Land Limited Partnership oil and gas lease with Ohio

Buckeye Energy, L.L.C. is dated January 11, 2011 ("Zehentbauer Lease"), and ECF No. 172-1 is

a true and correct copy.

3.  The Zehentbauer Lease contains the following provisions related to the sale of oil and

gas:

> 5.    **ROYALTIES**.  The Lessee covenants and agrees:
> a.    <u>Oil Royalty.</u>  To pay Lessor seventeen and one half percent
> (17.5%) royalty based upon the gross proceeds paid to Lessee from the sale of oil
> recovered from the leased premises valued at the purchase price received for oil
> prevailing on the date such oil is run into transporter trucks or pipelines.
> b.    <u>Gas Royalty.</u>  To pay to the Lessor seventeen and one half
> percent (17.5%) royalty based upon the gross proceeds paid to Lessee for the gas
> marketed and used off the leased premises, including casinghead gas or other
> gaseous substance, and produced from each well drilled thereon, computed at the
> wellhead from the sale of such gas substances so sold by Lessee in an arms-length
> transaction to an unaffiliated *bona fide* purchaser, or if the sale is to an affiliate of
> Lessee, the price upon which royalties are based shall be comparable to that which
> could be obtained in an arms length transaction (given the quantity and quality of

---

[3] *See* Joint Stipulations as to All Uncontested Facts (ECF No. 172).

the gas available for sale from the leased premises and for a similar contract term) and without any deductions or expenses except for Lessee to deduct from Lessor's royalty payments Lessor's prorated share of any tax, severance or otherwise, imposed by any government body. For purposes of this Lease, "gross proceeds" means the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises.

ECF No. 172-1 at PageID #: 5365.

4. The Hanover Farms Limited Partnership oil and gas lease with Ohio Buckeye Energy, L.L.C. is dated December 23, 2010 ("Hanover Lease"), and ECF No. 172-2 is a true and correct copy.

5. The Hanover Lease contains the following provisions related to the sale of oil and gas:

> 5. **ROYALTIES**. The Lessee covenants and agrees:
> a. Oil Royalty. To pay Lessor seventeen and one half percent (17.5%) royalty based upon the gross proceeds paid to Lessee from the sale of oil recovered from the leased premises valued at the purchase price received for oil prevailing on the date such oil is run into transporter trucks or pipelines.
> b. Gas Royalty. To pay to the Lessor seventeen and one half percent (17.5%) royalty based upon the gross proceeds paid to Lessee for the gas marketed and used off the leased premises, including casinghead gas or other gaseous substance, and produced from each well drilled thereon, computed at the wellhead from the sale of such gas substances so sold by Lessee in an arms-length transaction to an unaffiliated *bona fide* purchaser, or if the sale is to an affiliate of Lessee, the price upon which royalties are based shall be comparable to that which could be obtained in an arms length transaction (given the quantity and quality of the gas available for sale from the leased premises and for a similar contract term) and without any deductions or expenses except for Lessee to deduct from Lessor's royalty payments Lessor's prorated share of any tax, severance or otherwise, imposed by any government body. For purposes of this Lease, "gross proceeds" means the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises.

ECF No. 172-2 at PageID #: 5386-87.

(4:15CV2449)

6. The Robert Milton Young Revocable Trust, dated May 14, 1998 by Evelyn Frances Young as Successor Trustee is dated March 14, 2012 ("Young Lease"), and ECF No. 172-3 is a true and correct copy.

7. The Young Lease contains the following Royalty Clause:

> 9. **ROYALTIES**. The Lessee covenants and agrees:
> a. Oil Royalty. To pay to the Lessor TWENTY percent (20.0%) royalty based upon the gross proceeds paid to Lessee from the sale of oil, including without limitation other liquid hydrocarbons or their constituents and products thereof recovered from the leased premises so sold by Lessee in an arms-length transaction to an unaffiliated *bona fide* purchaser, or if the sale is to an affiliate of Lessee, the price upon which royalties are based shall be comparable to that which could be obtained in an arms-length transaction (given the quantity and quality of said products available for sale from the leased premises and for a similar contract term) and without any deductions or expenses. For purposes of this Lease, "gross proceeds" means the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises without deductions of any kind except as provided in paragraph 44.[4]
> b. Gas Royalty. To pay to the Lessor TWENTY percent (20.0%) royalty based upon the gross proceeds paid to Lessee for the gas marketed and used off the leased premises, including casinghead gas or other gaseous substance, and produced from each well drilled thereon, computed at the wellhead from the sale of such gas substances so sold by Lessee in an arms-length transaction to an unaffiliated *bona fide* purchaser, or if the sale is to an affiliate of Lessee, the price upon which royalties are based shall be comparable to that which could be obtained in an arms-length transaction (given the quantity and quality of the gas available for sale from the leased premises and for a similar contract term) and without any deductions or expenses. For purposes of this Lease, "gross proceeds" means the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises without deductions of any kind except as provided in paragraph 44.

ECF No. 172-3 at PageID #: 5409-10.

---

[4] *N.B.* Paragraph 44 only allows deductions for lessor's proportionate share of ad valorem taxes.

5

(4:15CV2449)

8.  TEPUSA purchased an undivided twenty-five percent (25%) of the working interest owned by Chesapeake Exploration, L.L.C. ("CELLC") in approximately 70,000 oil and gas leases in the State of Ohio.

9.  CELLC, Chesapeake Operating LLC ("COLLC") and Chesapeake Energy Marketing, L.L.C. ("CEMLLC") are subsidiaries of Chesapeake Energy, and affiliates of each other.

10.  Total Gas & Power North America, Inc. ("TGPNA") is an affiliate of TEPUSA.

11.  TGPNA maintains separate and distinct employees from TEPUSA.

12.  TGPNA maintains separate and distinct offices from TEPUSA.

13.  TGPNA maintains separate and distinct bank accounts from TEPUSA.

14.  TEPUSA's sale of its working interest share of natural gas to TGPNA is governed by a Base Contract for Sale and Purchase of Natural Gas dated January 1, 2010, a Transaction Confirmation effective as of July 1, 2012, and a First Amendment to the Transaction Confirmation effective as of September 1, 2013, and ECF No. 172-4 is a true and correct copy.

15.  TEPUSA's sale of its working interest share of oil and condensate to TGPNA is governed by an Oil Purchase and Sale Contract dated January 1, 2012, and ECF No. 172-5 is a true and correct copy.

16.  COLLC administers and manages the payment of the Plaintiffs' royalties on behalf of TEPUSA pursuant to a Services Agreement dated December 30, 2011, and ECF No 172-6 is a true and correct copy.

## II. Background

CELLC and a predecessor company, Ohio Buckeye Energy, LLC, entered into hundreds of oil and gas leases with landowners in Ohio, including the named Plaintiffs in the case at bar. These leases establish that CELLC and its assigns are entitled to produce oil and gas from beneath the surface of the landowners' properties in exchange for royalty payments based on the gross proceeds received from the oil and gas sold.

Plaintiffs have split the leases into three (3) subclasses. Group A's royalty provisions contain language governing the sale price and royalty percentage, but the gas royalty provisions contain a definitional clause and a comparable-sales requirement that the oil royalty provisions do not. The definitional clause outlines the substances governed by the provision and the comparable-sales requirement governs gas sales to companies affiliated with Defendants. Named Plaintiffs Zehentbauer Family Land Limited Partnership and Hanover Farms Limited Partnership are in the Group A subclass.

Group B's royalty provisions contain a definitional clause and comparable-sales requirement for both oil and gas sales. Named Plaintiff Robert Milton Young Revocable Trust, dated May 14, 1998 by Evelyn Frances Young as Successor Trustee is in the Group B subclass.

Finally, all of Group C's oil and gas royalty provisions have a definitional clause, but do not have a comparable-sales requirement. None of the named Plaintiffs are in the Group C subclass.

The lease agreements provide that Zehentbauer and Hanover are entitled to a 17.5% royalty and that Young is entitled to a 20% royalty "based upon the gross proceeds paid to

Lessee" from the sale of oil or gas sold from the leased premises. The leases define the term "gross proceeds" as "the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises."

For gas sales, the leases specify that the royalties are based on the gross proceeds paid to the defendants "computed at the wellhead." Royalties are based on Defendants' sales price when they sell gas "in an arms-length transaction to an unaffiliated *bona fide* purchaser." The comparable-sales requirement of the leases accounts for the possibility that Defendants might sell gas to their own affiliates. In such cases, the Zehentbauer and Hanover Leases provide that

> the price upon which royalties are based shall be comparable to that which could be obtained in an arms length transaction (given the quantity and quality of the gas available for sale from the leased premises and for a similar contract term) and without any deductions or expenses except for Lessee to deduct from Lessor's royalty payments Lessor's prorated share of any tax, severance or otherwise, imposed by any government body.

ECF No. 172-1 at PageID #: 5365; ECF No. 172-2 at PageID #: 5387.

The Young Lease has a nearly identical provision, but its exception for deducting Plaintiffs' share of taxes is incorporated in the sentence following the phrase "and without any deductions or expenses."

For oil sales, the Young Lease uses virtually the same royalty language, but omits the phrase "at the wellhead." The Zehentbauer and Hanover Leases, however, provide for the calculation of oil royalties based on "the purchase price received for oil prevailing on the date such oil is run into transporter trucks or pipelines."

Following the execution of these leases, CELLC assigned some of its rights under the leases to Defendants CHK Utica, L.L.C. and TEPUSA. CHK Utica is an affiliate of CELLC.

CELLC and CHK Utica are each counterparties to certain of the Gross Royalty Leases. In most cases, CELLC is both the counterparty and the operator of the wells. ECF No. 179-1 at PageID #: 5816 n. 3.

As permitted by the leases, Defendants sell the extracted oil and gas to their affiliates. CELLC and CHK Utica sell the oil and gas to an affiliated company called CEMLLC. *See* Deposition of Joshua Deven Bowles (ECF No. 167-2) at PageID #: 4470. TEPUSA sells the oil and gas to a corporate affiliate called TGPNA. TEPUSA absorbs the costs of the operations between production[5] and delivery to TGPNA and none of these costs are deducted from royalties owed to Plaintiffs. *See* Deposition of Jean DeRidder (ECF No. 176-2) at PageID #: 5590, Page 78; PageID #: 5601, Page 122. The Chesapeake Defendants also do not deduct post-production costs from Plaintiffs' royalties -- rather, post-production expenses are deducted from downstream sales to calculate the wellhead value of the gas, which is the value Plaintiffs' royalties are based on. ECF No. 179-1 at PageID #: 5830. These affiliates are midstream companies that buy raw or unprocessed oil, gas, and NGLs at the wellhead and then process the raw products, transport them, and sell them to unaffiliated downstream companies that in turn sell the refined oil and gas products to consumers. *See* ECF No. 167-2 at PageID #: 4471-72.

---

[5] *See Martin v. Glass*, 571 F.Supp. 1406, 1415 (N.D. Tex. 1983) ("[G]as is 'produced' when it is severed from the land at the wellhead." (citation omitted); " '[A]t-the-well ' refers to gas in its natural state, before the gas has been processed or transported from the well." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011); Expert Report of Kris L. Terry (ECF No. 179-3) at PageID #: 5846, ¶ 30 ("Wellhead" is a term of art in the oil and gas industry and refers to "the point at which oil or gas is severed from the ground on the lease or unit.").

Because Defendants sell the extracted oil and gas to affiliates, the royalty payments are governed by the lease provisions specifying that such payments are to be based on the prices that an unaffiliated entity would have paid for the oil and gas in an arms-length transaction.[6]  In order to determine the arms-length transaction price, Defendants and their midstream affiliates employ the "netback method."

The midstream company's costs of compression, dehydration, treating, gathering, processing, fractionation, and transportation to move the raw oil and gas from the wellhead to downstream resale locations are referred to as post-production costs.  The netback method is intended to account for the midstream costs associated with moving the raw oil and gas from the wellhead to the downstream markets.  Because the refined products that the midstream companies sell downstream are chemically distinct from the raw products extracted at the wellhead, and because the midstream products are closer to downstream markets, they are worth more than the raw upstream products.  This, in turn, means greater revenue for the Chesapeake Defendants and higher royalties for Plaintiffs.  After the oil, gas, and NGLs are transported downstream, CEMLLC resells it to a third party purchaser at a higher price.  *See* ECF No. 167-2 at PageID #: 4472-73.

The midstream affiliates, *e.g.*, CEMLLC, pay the reduced price calculated by the netback method to the upstream producers.  *See* Responses and Objections of Chesapeake Defendants to Plaintiffs' First Set of Interrogatories and Request for Production of Documents, Response to

---

[6]  Defendants appear to employ the same method when calculating Group A's oil royalties, despite the lack of comparable-sales language in the governing provision.

(4:15CV2449)

Interrogatory No. 4 (ECF No. 168-3 at PageID #: 4980-81); *see also* ECF No. 179-3 at PageID #: 5842, ¶¶ 15-16; PageID #: 5846, ¶ 32; ECF No. 167-2 at PageID #: 4470. TEPUSA takes the natural gas and sells it to TGPNA utilizing "an arithmetic formula" based upon a weighted average of resale prices TGPNA achieves far away from the wells that is "adjusted for TGPNA's actual costs of compression, dehydration, treating, gathering, fractionation, processing, and transportation" to move the raw gas from the wellhead sales points to the downstream resale locations. *See* TEPUSA's Objections and Answers to Plaintiffs' Interrogatories and Request for Production of Documents, Response to Interrogatory No. 10 (ECF No. 168-4 at PageID #: 4984); *see also* Affidavit of William F. Meyers, Jr. (ECF No. 112-2) at PageID #: 3648, ¶ 9; Affidavit of Jean DeRidder (ECF No. 112-1) at PageID #: 3606., ¶ 15; ECF No. 176-2 at PageID #: 5594-95, Pages 96-100.

Based on these prices, COLLC makes royalty payments to Plaintiffs on behalf of CELLC, CHK Utica, and TEPUSA. ECF No. 168-3 at PageID #: 4981; TEPUSA's Objections and Answers to Plaintiffs' Interrogatories and Request for Production of Documents, Response to Interrogatory No. 8 (ECF No. 168-2 at PageID #: 4978); ECF No. 112-1 at PageID #: 3607-3608, ¶ 19. TEPUSA pays Plaintiffs' royalties, by and through COLLC, based on 100% of the proceeds from its wellhead sales to TGPNA without deduction, other than certain taxes allowed by the Gross Royalty Leases. In other words, TEPUSA pays Plaintiffs their percentage of TEPUSA's gross proceeds. *See* ECF No. 112-1 at PageID #: 3607-3608, ¶ 19; ECF No. 176-2 at PageID #: 5601, Page 122. CEMLLC retains a 3% marketing fee for gas and a 1% marketing

fee for oil, which CELLC does not pass on to royalty owners. *See* ECF No. 168-3 at PageID #: 4981; ECF No. 167-2 at PageID #: 4491. Plaintiffs receive royalty checks and statements showing the prices, based on the netback method, at which the oil and gas would have purportedly been sold in arms-length transactions at the wellhead. These royalty statements consistently reflect zero dollars in deductions. *See, e.g.*, ECF No. 1-1 at PageID #: 158-64.

### III. Procedural History

The named Plaintiffs brought suit against Defendants in the Columbiana County, Ohio Court of Common Pleas for breach of contract. Class Action Complaint (ECF No. 1-1 at PageID #: 14-168). The named Plaintiffs seek relief on behalf of themselves and a class consisting of "[a]ll persons entitled to royalty payments" from Defendants under what Plaintiffs call "uniform oil and gas leases, known generally as Gross Royalty Leases." Memorandum of Opinion and Order (ECF No. 123) at PageID #: 3852. Plaintiffs identified 224 class members with interests in 295 leases with Defendants. Plaintiffs allege actual damages of "no less than $30 million dollars." ECF No. 1-1 at PageID #: 38, ¶ 92.

In the Class Action Complaint, Plaintiffs allege that Defendants are "failing to pay the full royalties due under the leases." ECF No. 1-1 at PageID #: 36, ¶ 85. They further assert that Defendants "calculat[e] the royalty payments using a price for oil and gas determined by a less than arms-length transaction" and that Defendants "systematically sell[ ] Oil and Gas to affiliated entities at below-market prices, and also pass[ ] improper and/or excessive production and/or post-production expenses to the lessors." ECF No. 1-1 at PageID #: 37, ¶¶ 89-90. Finally, Plaintiffs allege that they are qualified to represent a class of similarly situated landowners who

have leased their oil and gas rights to Defendants because, *inter alia*, the case would concern the common questions of "whether the Oil and Gas prices used by Defendants to calculate the Plaintiffs' royalties were less than the prevailing market values for those products" and "[w]hether the various types of post-production costs, expenses, or fees that were charged, directly or indirectly, by Defendants to Plaintiffs and the Class members breached the express and/or implied provisions of the Gross Royalty Leases." ECF No. 1-1 at PageID #: 32, ¶¶ d-e.

Defendants removed the case to this Court, asserting that federal jurisdiction exists pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). Thereafter, Plaintiffs moved to certify the putative class under Fed. R. Civ. P. 23(b)(3). They argued in their motion that all members of the putative class have been "identically affected" by Defendants' conduct. ECF No. 103-1 at PageID #: 3305. Specifically, they contended that all putative class members were equivalently affected by the fact that the defendants had improperly taken "deductions and expenses from the Plaintiffs' royalties" by "**us[ing] the netback method to adjust for pro rata postproduction expenses**." ECF No. 103-1 at PageID #: 3309 (emphasis in original). In other words, Plaintiffs argued that the only question necessary to determine Defendants' liability was the common question of whether the netback method violated the leases.

The Court granted Plaintiffs' Motion for Class Certification (ECF No. 103) regarding the Group A and Group B subclasses. Because none of the named Plaintiffs are in Group C, the Court concluded that Plaintiffs had failed to establish "typicality" under Rule 23(a)(3) with respect to the Group C subclass and, therefore, denied the motion with respect to Group C. ECF No. 123 at PageID #: 3845.

(4:15CV2449)

The Court agreed with Plaintiffs that "the issue of the propriety of the 'netback' method is the central issue in this case," and that "[t]he answer to that question will resolve the claims of each and every individual in the class." ECF No. 123 at PageID #: 3850. Although the Court acknowledged that individual issues governing the market prices of oil and gas at the wellhead were relevant, it ultimately concluded that analyzing those issues would become necessary only for calculating Plaintiffs' damages and, therefore, did not preclude class certification. Defendants responded by seeking leave to appeal the Court's class-certification order under Fed. R. Civ. P. 23(f), which leave was granted by the Court of Appeals for the Sixth Circuit. *In re: Total E&P USA, Inc., et al.*, No. 18-0309 (6th Cir. Nov. 19, 2018) (ECF No. 138).

In August 2019, the Sixth Circuit affirmed the Court's class-certification order. *Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496 (6th Cir. 2019) (ECF No. 173).

Plaintiffs' sole remaining theory of liability is that royalties be paid on the gross proceeds from sales of refined oil, gas, and NGLs by CEMLLC and TGPNA that occur at downstream sales points hundreds of miles from the leased premises, not the price received by CELLC and TEPUSA for the value of raw products at the wellhead.[7] Plaintiffs' theory, therefore, calls for gross proceeds from sales at CEMLLC's and TGPNA's resale points, of large volumes of

---

[7] Plaintiffs also previously espoused a theory that Defendants breached the Gross Royalty Leases by selling oil and gas to midstream affiliates at below-market prices at each wellhead. *See* Class Action Complaint (ECF No. 1-1 at PageID #: 14-168) at PageID #: 27, ¶ 48; PageID #: 37, ¶ 90; PageID #: 40, ¶ 107. Plaintiffs, however, stipulated during oral argument and asserted in their brief before the Sixth Circuit that they are proceeding solely on their post-production-costs theory of liability. *Id.* at 506.

(4:15CV2449)

processed gas, which are entirely different from the quality and quantity available for sale from the leased premises. *Id.* at 510.

### IV. Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of genuine dispute. An opposing party may not simply rely on its pleadings. Rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of

15

(4:15CV2449)

material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. The existence of some mere factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id.* This standard of review does not differ when reviewing cross-motions for summary judgment versus a motion filed by only one party. *United Food & Commercial Workers Union Local No. 17A v. Hudson Ins. Co.*, No. 5:11CV2495, 2012 WL 2343905, at *2 (N.D. Ohio June 20, 2012) (Pearson, J.).

## V. Analysis

The parties agree there are no disputed facts in this action. The only dispute is regarding the interpretation of the Leases. *See, e.g.*, ECF No. 168-1 at PageID #: 4947-48; Responses and

16

(4:15CV2449)

Objections of Chesapeake Defendants to Plaintiffs' First Set of Interrogatories and Request for Production of Documents, Response to Production Request No. 21 (ECF No. 168-5 at PageID #: 4988); ECF No. 178 at PageID #: 5782. Therefore, the Court agrees with the Chesapeake Defendants that the language of the Gross Royalty Leases is the beginning and the end of this case. ECF No. 179-1 at PageID #: 5813.

The parties also agree that Ohio law controls. ECF No. 168-1 at PageID #: 4954, 4956; ECF No. 178 at PageID #: 5789; ECF No. 179-1 at PageID #: 5820. The Ohio Supreme Court has held that oil and gas leases are contracts and "[t]he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument. . . ." *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 526 (2016) (quoting *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129 (1897)); *see also Farmers' Natl. Bank v. Delaware Ins. Co.*, 83 Ohio St. 309 (1911), paragraph six of syllabus ("In the construction of a contract courts should give effect, if possible, to every provision therein contained . . ."). "It is a well-known and established principle of contract interpretation that '[c]ontracts are to be interpreted so as to carry out the intent of the parties, *as that intent is evidenced by the contractual language.*' " *Id.* (emphasis added) (quoting *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 247 (1974); *see also Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th Cir. 2014) ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.") (quoting *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 404 (2011)). A court must "look to the plain and ordinary meaning of the language used" and "is not permitted to alter

17

a lawful contract by imputing an intent contrary to that expressed by the parties." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219 (2003). "Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citations omitted); *see also Lutz v. Chesapeake Appalachia, LLC*, No. 4:09CV2256, 2017 WL 4810703, at *6 (N.D. Ohio Oct. 25, 2017) (Lioi, J.); *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241(1978), paragraph one of syllabus. When a contract is unclear or ambiguous, or when circumstances surrounding the agreement give special meaning to the plain language, extrinsic evidence is admissible to ascertain the intent of the parties. *Id.* On the other hand, "[i]f a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 322 (1984) (citing *Alexander, supra*).

### A. Which Party Bears the Burden of Post-Production Costs?

An issue presented in the case at bar is which party bears the burden of post-production costs (those costs associated with transporting, processing, compressing, and treating oil, gas, associated hydrocarbons, and by-products thereof into marketable form). Plaintiffs seek a determination that the language in their Gross Royalty Leases provide for the calculation of royalties based upon gross proceeds, without any deductions or expenses (including post-production costs), except for a prorated share of governmentally imposed taxes. Therefore, the parties' express intent is Defendants bear all post-production costs. According to Defendants, royalties to be paid the lessors are based on the net proceeds (after the deduction of

post-production costs) paid for the oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises.

### 1. Plaintiffs' Position

The word "computed" refers to volume and modifies the words "gas marketed and used" (and variations thereof). "Computed at the wellhead" refers to volume and modifies the words gas marketed and used, a perfectly natural requirement given that the meter only calculates the gas from the well, not the gas attributed to the individual lessors in the pool. ECF No. 168-1 at PageID #: 4961.

Plaintiffs make three (3) arguments in support of their position. First, Plaintiffs contend their Gross Royalty Leases providing for "gross proceeds" without any deductions or expenses are quantitatively different from Chesapeake's standard Ohio form Paid-Up Oil and Gas Lease royalty provisions (ECF No. 168-11 at PageID #: 5072; ECF No. 168-12 at PageID #: 5086), which expressly allow for deductions of post-production costs and a payment based on net proceeds. ECF No. 168-1 at PageID #: 4962-66. Given that the Gross Royalty Leases are unambiguous, the Court finds this argument raises extraneous and irrelevant evidence. *Eastham*, 754 F.3d at 361. A court "may not use extrinsic evidence to create an ambiguity; the ambiguity must be 'apparent on the face of the contract.' " *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (citation omitted). "If no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to demonstrate such an ambiguity." *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635, 638 (1992) (citation omitted). Moreover, Ohio law requires the Court to interpret the Leases based on the language the parties selected for their

(4:15CV2449)

contract, not extraneous language from other sources.  *Lutz*, 148 Ohio St.3d at 526 (quoting

*Harris*, 57 Ohio St. at 129).

      Second, an undivided one-half interest in a property located in Carroll County, Ohio is

subject to the Young Lease (ECF No. 172-3) providing for "gross proceeds " without

deductions of any kind."  According to Plaintiffs, the other undivided one-half interest in the

same property was subject to an earlier net proceeds lease (ECF No. 168-13 at PageID #: 5102-

5106).  Both leases are held by the Chesapeake Defendants.  *See* Affidavit of Evelyn Frances

Young (ECF No. 168-13) at PageID #: 5097-98, ¶¶ 4-5.  Defendants pay the Lessors for identical

production from identical units.  *See* ECF No. 168-13 at PageID #: 5100, ¶ 10.  The royalty

statements of the Lessors show that Defendants treated the net proceeds and Gross Royalty Lease

exactly the same despite their "vastly different" royalty language.  The production numbers and

deductions are identical with the only difference being the payment decimal, based on the

different royalty percentages ("one-eighth . . ." in the net proceeds lease and 20% in the Gross

Royalty lease).  *See* ECF No. 168-13 at PageID #: 5100-5101, ¶¶ 11-14.  Plaintiffs contend this

shows a violation of the Gross Royalty Lease (ECF No. 172-3).  But it does not.  CELLC's sale

to CEMLLC and TEPUSA's sale to TGPNA triggers the plain language of the lease concerning

affiliate sales.  Though CELLC and TEPUSA pay royalties on their gross proceeds, under the

affiliate clause, Ms. Young cannot prove a breach unless the *prices* upon which her royalties

were *based* were *not* "*comparable* to that which could be obtained in an arms-length transaction

(given the quantity and quality of [the gas] available for sale from the leased premises . . .)"  ECF

No. 172-3 at PageID #: 5410 (emphasis added).

(4:15CV2449)

Third, in 2014, the Chesapeake Defendants were taking deductions under the Christensen

Gross Royalty Lease (ECF No. 168-14), the lessors of which are members of the class.  But, they

are not class representatives.  A portion of the acreage under the Christensen Lease was included

in a Gulfport Energy well.  According to Plaintiffs, the Chesapeake Defendants originally

instructed Gulfport Energy to take deductions under the lease pursuant to the "wellhead"

language.  Attorney Williams contacted the Chesapeake Defendants and raised the gross

proceeds language and disputed the validity of the post-production deductions.  *See* Declaration

of William G. Williams (ECF No. 168-15) at PageID #: 5163-67.  On November 4, 2014,

Attorney Keith Moffatt, in-house counsel at Chesapeake Energy, informed Attorney Williams

that his recommendation was for the Chesapeake Defendants to instruct Gulfport Energy not to

deduct post-production costs.  *See* ECF No. 168-15 at PageID #: 5168.  Subsequently, Attorney

Moffatt informed Attorney Williams that Chesapeake decided "to go ahead and advise Gulfport

to stop deducting post-production costs, and they will reimburse for the deductions previously

taken."  ECF No. 168-15 at PageID #: 5169.  But, Attorney Moffatt did not say why Chesapeake

made the decisions it did.  The Court finds this third argument of Plaintiffs is also related to

extraneous and irrelevant hearsay evidence, and the use of such extrinsic evidence is improper

for the reasons set forth above.  Moreover, a party may not rely on facts that "cannot be presented

in a form that would be admissible in evidence" at the summary judgment stage.  Fed. R. Civ. P.

56(c)(2); *see also Gardner v. City of Cleveland*, 656 F. Supp.2d 751, 757 (N.D. Ohio 2009)

(Nugent, J.) ("[It] is well settled that only admissible evidence may be considered by the trial

(4:15CV2449)

court in ruling on a motion for summary judgment.") (quoting *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)).

Plaintiffs cite *Busbey v. Russell*, 10 Ohio C.D. 23 (Ohio Cir. Ct. 1898), an inapposite case that is over a century old and has not been cited in a case since its original publication, in support of their position. In *Busbey*, the Ohio appellate court interpreted a royalty provision in a lease between a farmer and a company engaged in "developing" oil and gas territory to determine whether the royalty was to be paid on the gross or net income. The oil royalty clause provided that "one-eighth part of all the oil produced and saved was . . . to be delivered to the lessor, free of expense into tanks or into pipe lines to his credit." *Id.* at 26. The gas royalty clause provided that if wells produced gas in sufficient quantities to justify marketing, the lessor "should be paid at the rate of one-eighth of income dollars per year for such well so long as the gas therefrom should be sold." *Id.* The court concluded:

> . . . the contract in this case makes it clear that the parties intended gross income, and not net.
>
> It is a matter of common observation that royalties on minerals are assessed on the marketable amount produced, or are made a share of the amount produced; and it is fairly to be inferred that when the lessor in this instance stipulated for one-eighth of the income from the gas produced and sold, he intended, and it was understood to be, one-eighth of the gross income or receipts from the sale; and the stipulation as to the oil, we think, places it beyond question.
>
> It was impracticable to deliver one-eighth of the gas itself to the lessor as was to be done with the oil, and it seems reasonable that he would stipulate for the same proportion of the receipts from the marketed gas, instead of running the risk of no substantial return for the gas by reason of bad financial management and wasteful expenditures on the part of the lessees. Further, it is fair to assume that, with such

a provision in regard to the oil, if the parties intended the royalty on the gas to be one-eighth of the net income, they would have said so in the contract.

*Id.* at 26-27.

One commentator noted the *Busbey* court "recognizes that the proper calculation of royalty depends upon the wording of the applicable royalty clause and implicitly rejects the notion of a property law definition of the royalty obligation. . . . *Busbey* . . . emphasizes that royalty clauses should not be construed by isolating and defining specific words, but by construing the entire royalty provision as a whole. . . ." Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations be Determined Intrinsically, Theoretically, or Realistically?*, 37 Nat. Resources J. 547, 593 (Summer 1997).

Plaintiffs maintain the Gross Royalty Leases are clear and unambiguous regarding how royalties are to be paid. ECF No. 168-1 at PageID #: 4970 ("Plaintiffs' believe the royalty language alone is sufficiently clear and unambiguous regarding how royalties are to be paid -- without any deductions or expenses."); ECF No. 183 at PageID #: 5914 ("Support for Plaintiffs' position is found in the clear and unambiguous language of the leases themselves."); ECF No. 184 at PageID #: 5928 ("all parties 'agree' that the lease language clearly and unambiguously describes how the plaintiffs' royalties are to be computed"). However, if they are unclear or ambiguous, Plaintiffs note that Defendants' contractual duty to market (*i.e.*, sell) the oil and gas weighs in favor of Plaintiffs' interpretation because under general contract law a party bears the burden or cost of his own performance. The contractual obligation to market carries with it the burden of the cost of that performance. *Allen, Heaton & McDonald v. Castle Farm Amusement Co.*, 151 Ohio St. 522, 522 (1949) (plaintiff, an advertising agency, entered into a contract to

provide service to defendant); *see also* [Rogers v. Westerman Farm Co., 29 P.3d 887, 906 (Colo. 2001), as modified on denial of reh'g (Aug. 27, 2001)](#) (holding when the leases are, in fact, silent with respect to the allocation of costs, the lessee's duty to market requires that the lessee bear "the expense of getting the product to a marketable condition and location"); [*Estate of Tawney v. Columbia Nat. Res., L.L.C.*, 633 S.E.2d 22, 30 (W.Va. 2006)](#) (holding language in leases was ambiguous and, accordingly, not effective to permit lessee to deduct from the lessors' royalty any portion of the costs incurred between the wellhead and the point of sale).

The approaches articulated in *Rogers* and *Estate of Tawney*, however, were specifically rejected by the district court in *Lutz*. [2017 WL 4810703, at *6 and n.7](#). *Rogers* is contrary to Ohio law, and the *Lutz* court cites it as an example of a court rejecting the view that the *Lutz* court adopts. [*Id.* at *6 n.7](#). Similarly, the plaintiffs in *Lutz* relied "entirely" on *Estate of Tawney* for the proposition that "the 'at the well' language is ambiguous because it does not address how to treat deduction of post-production costs." [*Id.* at *7](#). The *Lutz* court rejected *Estate of Tawney* in holding "the Ohio Supreme Court would adopt the 'at the well' rule, simply applying the clear and unambiguous language in the leases." [*Id.* at *7](#).

The Court has already dismissed Plaintiffs' implied covenant claims set forth in Count Two of the Class Action Complaint ([ECF No. 1-1 at PageID #: 14-168](#)), which included a claim for breach of an implied covenant of marketability. *See* Memorandum of Opinion and Order ([ECF No. 44](#))[8] at PageID #: 523-24; Memorandum of Opinion and Order ([ECF No. 45](#))[9] at

---

[8] Counts Two and Four and the claim for breach of express covenant to market in Count Three of the Class Action Complaint ([ECF No. 1-1 at PageID #: 14-168](#)) were

(continued...)

(4:15CV2449)

PageID #: 533-34.  In addition, the "marketable product rule" has not been adopted in Ohio.

*Lutz*, 148 Ohio St.3d at 527 (noting that whether Ohio follows the "at-the-well" rule or the "marketable product" rule was the certified question presented and declining to answer).

Accordingly, Plaintiffs' argument, relying upon the "marketable product" rule, is plainly barred by the Court's prior dismissal order.

### 2. Defendants' Position

Defendants agree the royalty provisions unambiguously state ". . . , *or if the sale is to an affiliate of Lessee, the price upon which royalties are based shall be comparable to that which could be obtained in an arms length transaction* (given the *quantity* and *quality* of the gas available *for sale from the leased premises* and for a similar contract term) . . . ." ECF No. 172-1 at PageID #: 5365; ECF No. 172-2 at PageID #: 5387; ECF No. 172-3 at PageID #: 5410 (emphasis added).  The summary judgment evidence, which Plaintiffs are unable to rebut, is that the price upon which royalties are paid is comparable to that which could have been obtained in an arms length sale.  Declaration of Bob Broxson (ECF No. 109-1) at PageID #: 3547-50, ¶¶ 50-60.

---

[8](...continued)
dismissed as to the Chesapeake Defendants, Pelican Energy, L.L.C., and Jamestown Resources, L.L.C.  ECF No. 44 at PageID #: 530.

[9] Counts Two and Four of the Class Action Complaint (ECF No. 1-1 at PageID #: 14-168) were dismissed as to Plaintiffs' individual claims against TEPUSA relating to Plaintiffs' individual interests in their leases with TEPUSA.  ECF No. 45 at PageID #: 536.

(4:15CV2449)

Plaintiffs' "gross proceeds" argument, as articulated, does not follow the lease terms at all.  Their interpretation improperly renders a substantial portion of the royalty provisions meaningless.  *Farmers' Natl. Bank*, *supra*, paragraph six of syllabus ("[I]f one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must [be used]").  According to Defendants, Plaintiffs seek to rewrite the lease language as follows:

> b.   Gas Royalty.  To pay to the Lessor seventeen and one half percent (17.5%) royalty based upon the gross proceeds paid to Lessee for the gas marketed and used off the leased premises, including casinghead gas or other gaseous substance, and produced from each well drilled thereon, ~~computed at the wellhead from the sale of such gas substances so sold by Lessee in an arms-length transaction to an unaffiliated *bona fide* purchaser, or if the sale is to an affiliate of Lessee, the price upon which royalties are based shall be comparable to that which could be obtained in an arms length transaction (given the quantity and quality of the gas available for sale from the leased premises and for a similar contract term) and~~ without any deductions or expenses except for Lessee to deduct from Lessor's royalty payments Lessor's prorated share of any tax, severance or otherwise, imposed by any government body.  For purposes of this Lease, "gross proceeds" means the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises.

ECF No. 172-1 at PageID #: 5365; ECF No. 172-2 at PageID #: 5387 (strikeout added).

If Plaintiffs' "gross proceeds" blanket interpretation prevailed, there would be no reason for the parties to consider the two distinct factual scenarios for paying royalties explicitly outlined in the royalty provisions.  By deleting and avoiding lease terms (*e.g.*, "or," "based," "comparable," "arms length transaction," "affiliate," "quantity and quality," and "available for sale from the leased premises"), thus rendering a substantial portion of the Lease language superfluous, Plaintiffs go against the directives set forth in *Lutz*, 148 Ohio St.3d at 526, and

violate well-established Ohio contract law. *Dore & Associates Contracting, Inc. v. City of Columbus, OH*, 726 Fed.Appx. 997, 1000 (6th Cir. 2018) (citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 362 (1997)); *see also Filicky v. American Energy-Utica, LLC*, 645 Fed.Appx. 393, 398 (6th Cir. 2016) ("We generally seek to 'avoid interpreting contracts to contain superfluous words.' ") (quoting *TMW Enters, Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010)); *Eastham*, 754 F.3d at 363 ("[A] contract must be construed in its entirety and in a manner that does not leave any phrase meaningless or surplusage.") (quoting *Local Mktg. Corp. v. Prudential Ins. Co.*, 159 Ohio App.3d 410, 414 (2004)); *Van Ligten v. Emergency Servs., Inc.*, No. 11AP-901, 2012 WL 2517552, at *6 (Ohio App. 10th Dist. June 29, 2012) ("A court 'must give meaning to every paragraph, clause, phrase and word, omitting nothing as meaningless, or surplusage.'") (quoting *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994)); *State v. Bethel*, 110 Ohio St.3d 416, 424 (2006) ("[A]n interpretation that would render a provision meaningless . . . is neither acceptable nor desirable under the normal rules of contract construction.") (internal quotation marks and citation omitted).

Plaintiffs' modifying and subsuming the "affiliate sale" independent clause into a "gross proceeds" analysis from the preceding independent clause also fails under fundamental rules of grammar. *In re Tanguay*, 427 B.R. 663, 671 (Bankr. E.D. Tenn. 2010) (finding that use of "or," in the language meant the "clauses are independent of one another" and do not modify one another). The Gross Royalty Leases contemplate two factual scenarios that are separated by the coordinating conjunction "or" indicating two independent clauses of equal rank.

**B.     Whether Royalties are to be Valued Based on a Wellhead or Downstream Sales Price.**

A second issue in dispute between the parties is whether royalties are to be valued based on a wellhead or downstream sales price.  The Chesapeake Defendants rely on two documents to support CELLC's sale to its affiliate, CEMLLC:  (1) a Base Contract for Sale and Purchase of Natural Gas between CELLC and Chesapeake Energy Marketing, Inc. ("CEMI") ("Gas Sales Contract") (ECF No. 168-16) and (2) a Oil Purchase and Sale Contract and amendments thereto ("Oil Sales Contract") (ECF No. 168-17).  Contrary to No. 5 of the parties' prior Stipulations (ECF No. 92) at PageID #: 1020,[10] Plaintiffs directly contest the alleged "sale" of the hydrocarbons from CELLC to CEMLLC under the Leases at issue.  Plaintiffs argue the gross proceeds language in the Leases applies regardless of whether the post-production costs were contracted for by CELLC or its affiliate, CEMLLC.  To the extent it matters who incurred the costs, Plaintiffs dispute the validity of any transfer to CEMLLC.  They argue against the characterization of the transfer of hydrocarbons from CELLC to CEMLLC as a valid sale based on (1) the lack of signed sales agreements between the companies and (2) the existence of a signed Agency Agreement (ECF No. 182-1).[11]  ECF No. 168-1 at PageID #: 4973.

---

[10] ". . . Since the date of first production from the Wells, Chesapeake Exploration has sold all or substantially all its working interest share of the oil and gas produced from the Wells to Chesapeake Energy Marketing, L.L.C. ('CEMLLC'). . . ."

[11] The Chesapeake Defendants did not produce the Agency Agreement (ECF No. 182-1) during discovery in the case at bar and Plaintiffs have not identified how it was obtained.  *See* ECF No. 167-2 at PageID #: 4600 ("Mr. Donovan:  Where did you get it [the Agency Agreement] from?  Mr. Murray:  I don't know.").

Plaintiffs contend that both the Gas Sales Contract (ECF No. 168-16) and the Oil Sales Contract (ECF No. 168-17) are defective on their face. The Gas Sales Contract (ECF No. 168-16) is not signed. According to Plaintiffs, this is fatal to the alleged contract, which states at ¶ 2.4: " 'Base Contact' shall mean a contract *executed* by the parties. . . ." ECF No. 168-16 at PageID #: 5174 (emphasis added). The Oil Sales Contract states that it covers "all Oil owned or controlled by Seller in the 'Contract Areas' identified on Exhibit 'A.' " ECF No. 168-17 at PageID #: 5184. Exhibit A to the most recent 2003 amendment to the Oil Sales Contract (ECF No. 168-17 at PageID #: 5197-5202), however, fails to list Ohio.

That certain contracts between CELLC and CEMLLC are signed or unsigned does not matter. What matters is the parties' course of dealing, and pursuant to that course of dealing, CELLC sells the oil, gas, and NGLs extracted from Plaintiffs' wells to CEMLLC at the wellhead. *Richard A. Berijian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 151-53 (1978) (concluding the directory-advertising agreement did not require the signature of the customer to be effective, and that Ohio Bell was justified in believing that the doctor had accepted the terms and conditions of the written agreement); *Beck Aluminum Int'l., LLC v. Aluar Aluminio Argentino S.A.I.C.*, No. 1:09CV2978, 2010 WL 3260017, at *6-7 (N.D. Ohio Aug. 18, 2010) (Gaughan, J.) (upholding an unsigned contract where there were spaces for the signatures of both parties but no other evidence that the parties intended for signatures to be a condition precedent to the agreement's enforceability). As Deven Bowles, Accounting Manager at COLLC attests, "CELLC and CEMLLC operated pursuant to the essential terms of the Gas Sales Contract at all times," regardless of whether a signed copy is available. Affidavit of J. Deven Bowles (ECF No.

(4:15CV2449)

179-5) at PageID #: 5882, ¶ 8.  Finally, this Court previously found that the sale from CELLC to

CEMLLC is real.  *Henceroth v. Chesapeake Exploration, L.L.C.*, No. 4:15CV2591, 2019 WL

4750661 (N.D. Ohio Sept. 30, 2019) (Pearson, J.), appeal pending, No. 19-3942 (6th Cir.).  In

addition, one Ohio court recently found the sale from CELLC to CEMLLC is a *bona fide* sale.

*Gateway Royalty, L.L.C. v. Chesapeake Exploration, L.L.C.*, No. 2017CVH28970 (Ohio Ct.

Com. Pl. Carroll Cty. July 15, 2019),appeal pending, No. 2019CA933 (Ohio App. 7th Dist.).

The Agency Agreement (ECF No. 182-1) specifically states CEMI is CELLC's agent to

market, contract, sell, and receive payment in CEMI's own name for CELLC's oil and gas:

> From the date of this Agency Agreement and forward, for a term of twenty (20)
> years and continuing for successive one year terms subject to a 30-day notice
> requirement in the event either Party wishes to cancel this Agency Agreement
> during the initial or any successive one-year terms, the Owner hereby designates
> CEMI as its lawful agent to conduct oil and gas marketing and administration on
> its behalf, including, and without limitation, negotiating, contracting for, and
> selling in CEMl's name Owner's proportionate share of any oil and/or gas
> produced from wells in which Owner has an interest.  CEMI is further authorized
> to receive payments from purchasers of proceeds from the sale of Owner's oil and
> gas and remit to the proper authorities any taxes assessed on said proceeds.

ECF No. 182-1 at PageID #: 5892.  According to the Chesapeake Defendants, the Agency

Agreement (ECF No. 182-1) is not at issue in the case at bar.  ECF No. 179-1 at PageID #: 5827.

Plaintiffs do not cite any evidence that the Agency Agreement (ECF No. 182-1) was ever applied

or controlled the relationship of CELLC and CEMLLC in Ohio.  To the contrary, the only

evidence in this case shows that the Agency Agreement (ECF No. 182-1) never applied to Ohio

operations.  *See* ECF No. 179-5 at PageID #: 5882-83, ¶ 10 ("the CHK Louisiana Agreement was

never applied to Ohio production").  Plaintiffs do not offer any legal support for their contention

that an agency agreement between CELLC and CEMLLC would void the *bona fide* sale.  Finally,

30

the Court finds this argument of Plaintiffs is related to extraneous and irrelevant evidence, and the use of such extrinsic evidence is improper for the reasons set forth above.

Plaintiffs argue the determination of the validity of the "sale" from CELLC to CEMLLC is directly germane to the interpretation of the Leases at issue and permissibility of the Chesapeake Defendants' deductions. Plaintiffs argue there is no sale at or near the wellhead, and the Chesapeake Defendants have no right to deduct their own post-production costs. The unrebutted summary judgment evidence, however, is that the gas is available for sale at or near the wellhead, which is where TGPNA purchases it from TEPUSA. *See* ECF No. 176-2 at PageID #: 5591-92, Pages 85-86; ECF No. 109-1 at PageID #: 3547, ¶¶ 48-49; ECF No. 112-1 at PageID #: 3606 ¶ 14.

Plaintiffs contest the Chesapeake Defendants' argument regarding the valuation point. The Chesapeake Defendants maintain the "gross proceeds" language does not change the point of valuation; it simply sets forth how the calculation is to be conducted at the point of valuation, *i.e.*, at the wellhead. ECF No. 179-1 at PageID #: 5825. Contrary to Plaintiffs' suggestion, the Chesapeake Defendants do not "argue for an 'at the well' rule that would defeat the express lease terms." ECF No. 168-1 at PageID #: 4945. Citing both state and federal case law, Defendants assert that the netback method is properly used to determine the wellhead value of the gas, including a means of determining a price to be paid at the point of sale by the buyer to the seller. As the Fifth Circuit held, in reviewing a similar gas sales contract and a lease that had express no deduction language, this type of pricing formula "does not burden or reduce the value of the royalty." *Potts v. Chesapeake Exploration, L.L.C..*, 760 F.3d 470, 475 (5th Cir. 2014) (internal

(4:15CV2449)

quotation marks omitted); *see also Tana Oil and Gas Corp. v. Cernosek*, 188 S.W.3d 354, 360 (Tex. App. 2006) (the netback method is a "pricing formula [that] represents the negotiated value of the raw gas").

Contrary to Plaintiffs' argument, ECF No. 168-1 at PageID #: 4961, the Chesapeake Defendants contend the words "computed at the wellhead" appear in the sentence "computed at the wellhead *from the sale* of such gas substances so sold by Lessee[.]" ECF No. 172-1 at PageID #: 5365; ECF No. 172-2 at PageID #: 5387 (emphasis added). What is "computed . . . from the sale" must be the proceeds of those sales. Moreover, even if "computed at the wellhead" did modify "gas marketed and used," that would only mean that the gas will be "marketed," *i.e.*, sold, in transactions that are "computed at the wellhead," not downstream. ECF No. 179-1 at PageID #: 5825 n. 9.

As explained in *Warren v. Chesapeake Exploration, L.L.C.*, 759 F.3d 413 (5th Cir. 2014), language such as "without any deductions or expenses" in the Gross Royalty Leases "does not change the point at which all royalty is computed, which is the mouth of the well." *Id.* at 418. The Court finds the Lease language in the case at bar,"without any deductions or expenses" means CELLC and TEPUSA may not deduct the post-production costs they pay prior to the sale to CEMLLC or TGPNA. Thus, CELLC and TEPUSA follow the "without any deductions or expenses" Lease language by taking no deductions for their post-production costs from the price they receive from the affiliate sales to CEMLLC or TGPNA.

Numerous other courts have held that when royalties are to be paid based on the value of oil, gas, and NGLs at the wellhead, the netback method is an appropriate way to calculate the

wellhead value. *See Poplar Creek*, 636 F.3d at 244 ("Kentucky follows the 'at-the-well' rule, which allows for the deduction of post-production costs prior to paying appropriate royalties."); *Lutz*, 2017 WL 4810703, at *5, *8 (describing the "net-back" method and holding that royalties should be calculated "at the well"); *Aker v. Keeton Group, LLC*, No. 3:2009-101, 2011 WL 13235036, at *4-6 (W.D. Pa. March 15, 2011) (finding lease with language providing royalties be paid on "revenue realized" or oil and gas "produced and marketed from the [l]easehold" called for a wellhead price royalty via the netback method); *Anderson Living Trust v. Energen Resources Corp.*, 886 F.3d 826, 833 n.10 (10th Cir. 2018) (It makes "little sense to say that the royalty owners are bearing the post-production costs" under the netback calculation); *Ramming v. Nat. Gas Pipeline Co. of Am.*, 390 F.3d 366, 372 (5th Cir. 2004) (per curiam) (under the netback method, "all increase in the ultimate sales value attributable to the expenses incurred in transporting and processing the commodity must be deducted because that is the way to arrive at the value of the gas at the moment it escapes from the wellhead") (ellipses and brackets omitted) (quoting *Martin*, 571 F. Supp. at 1414).

The Chesapeake Defendants also cite state case law in support of their assertion that the netback method is properly used to determine the wellhead value of the gas. *See Baker v. Magnum Hunter Prod., Inc.*, 473 S.W.3d 588, 594-95 (Ky. 2015) (citing *Poplar Creek*); *Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147, 1158 (Pa. 2010) (Pennsylvania law "permit[s] the calculation of royalties at the wellhead, as provided by the net-back method in the Lease"); *Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887, 893-95 (Mich. Ct. App. 1997) (finding that

leases using "at the wellhead" language must permit deduction of post-production costs to give effect to the language in the contract between the parties).

The royalty paragraph in the Gross Royalty Leases envisions two distinct factual scenarios that determine how royalties will be paid based on the facts. Those scenarios are:

> (1) if the Lessee sells production in an arms-length sale to an **unaffiliated** *bona fide* purchaser, royalties will be paid on "the gross proceeds **paid** to Lessee . . . computed at the wellhead from the sale of such gas substances"; and

> (2) if the sale is to an **affiliate** of Lessee, "the **price** upon which royalties are **based** shall be comparable to that which could be obtained in an arms length transaction (given the quantity and quality of the gas available for sale from the leased premises and for a similar contract term)."

ECF No. 172-1 at PageID #: 5365; ECF No. 172-2 at PageID #: 5387; ECF No. 172-3 at PageID #: 5409-10 (bold emphasis added). Thus, to prevail under the second scenario, Plaintiffs must show that the netback price CEMLLC paid to CELLC is not comparable to that which could have been obtained in a sale to an unaffiliated third party at the wellhead.

Plaintiffs' key "gross proceeds" theory of liability (*i.e.*, that deductions are being taken from the price received by CELLC from CEMLLC or TEPUSA from TGPNA) rests on a false premise, and clearly fails as a matter of Ohio law. Under the express Lease terms, the actual price paid to CELLC/TEPUSA does not ultimately determine the amount of royalty to which the lessor is entitled under the affiliate-sales scenario. In this scenario, the price used by CELLC/TEPUSA for royalty payments, regardless of the price it was actually paid, must be "comparable" to that which could be obtained in an arms length sale for similar gas. *See Yzaguirre v. KCS Resources, Inc.*, 53 S.W.3d 368, 374 (Tex. 2001) (holding that the price a producer received under a gas sales contract is not relevant to determination of market value).

34

(4:15CV2449)

The objective standard set forth in the plain language of the Gross Royalty Leases is that the price on which royalties are *based* shall be comparable to that which *could* be obtained in an arms length sale. Therefore, if CEMLLC pays CELLC or TGPNA pays TEPUSA a price that is greater than what could be obtained in an arms length sale, CELLC/TEPUSA may pay a royalty based on the lower price a non-affiliated buyer would pay for the same gas. *Id.* When the sale is to an affiliate, Plaintiffs agreed to receive royalties based on the real market value of the gas, not on the proceeds from the sale. *Id.*; *see also Matzen v. Cities Service Oil Co.*, 667 P.2d 337, 344-45 (Kan. 1983) (noting "[t]hat market value must be determined by comparable sales" and "market value may be higher than the contract price").

In *Bounty Minerals, LLC v. Chesapeake Exploration, L.L.C.,* No. 5:17CV1695, 2019 WL 7171353 (N.D. Ohio Dec. 23, 2019) (Barker, J.),[12] appeal pending, No. 20-3043 (6th Cir.), the district court interpreted the very same "computed at the wellhead" lease language that is before the Court in the case at bar, and granted CELLC and COLLC's Motion for Summary Judgment. In *Bounty Minerals*, the key issue was whether the phrase "computed at the wellhead" applies both to sales to (1) "unaffiliated *bona fide* purchasers" and (2) affiliated entities such as CEMLLC. The plaintiff argued that it did not. The district court disagreed with the plaintiff's

---

[12] Plaintiffs' Amended Motion to Transfer *Bounty Minerals* to This Court (ECF No. 170) was denied. *See* Marginal Order dated July 25, 2019. The certified class of landowners in the case at bar filed a Motion for Leave to File *Amicus Curiae* Brief (ECF No. 99 in No. 5:17CV1695) in *Bounty Minerals*. The motion was denied. The Court rejected the arguments of the *Zehentbauer* class that it lacked subject-matter jurisdiction and/or that the parties had failed to join indispensable parties pursuant to Fed. R. Civ. P. 19. *Bounty Minerals, LLC v. Chesapeake Exploration, LLC,* No. 5:17CV1695, 2019 WL 7048981 (N.D. Ohio Dec. 23, 2019) (Barker, J.).

(4:15CV2449)

proposed construction of the gas royalty provisions, and held the lease language at issue created only one valuation point for both unaffiliated and affiliated sales -- "at the wellhead." *Id.* at *10-12. This Court agrees with and adopts the reasoning and result in *Bounty Minerals*. The Court concludes royalties are to be valued based on the wellhead value of the oil, gas, and NGLs and, therefore, the deduction of post-production costs are authorized. Other courts have also interpreted the language "at the well" as unambiguously allowing for the deduction of post-production costs. *See e.g.*, *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 Fed.Appx 459, 467 (6th Cir. 2019) (when the leases at issue provide that royalties were to be based on the "gross proceeds" "without deductions of any kind," "[the operator] may properly deduct post-production costs from the royalties it pays"); *Cunningham Prop. Mgmt. Trust v. Ascent Resources - Utica, LLC*, 351 F. Supp.3d 1056, 1062 (S.D. Ohio 2018); *Lutz*, 2017 WL 4810703 at *8 ("the parties' intent was that the *location* for valuing the gas for purposes of computing the royalty was 'at the well'") (emphasis in original); *Schroeder*, 565 N.W.2d at 894 ("gross proceeds at the wellhead" contemplates the deduction of post-production costs from the sale price of the gas, based on the view that "at the wellhead" refers to location for royalty valuation purposes); *Burlington Resources Oil & Gas Co. LP v. Texas Crude Energy, LLC*, 573 S.W.3d 198, 205 (Tex. 2019) ("when the parties specify an 'at the well' valuation point, the royalty holder must share in post-production costs regardless of how the royalty is calculated") (citations omitted).

### C. The Chesapeake Defendants Have Not Breached the Covenant to Act as a Reasonably Prudent Operator

As an alternative breach of contract claim -- in Count Three of the Class Action Complaint, Plaintiffs claim that the Chesapeake Defendants breached the covenant to "act as a reasonable prudent operator exercising good faith." ECF No. 1-1 at PageID #: 14-168 at PageID #: 39, ¶ 103. According to Plaintiffs, the Chesapeake Defendants' failure to follow the clear and unambiguous lease language as to the methodology to be used in calculating Plaintiffs' royalties breaches their obligation to act as a reasonably prudent operator. However, Plaintiffs are proceeding only on their post-production costs theory of liability for the breach of contract claim in Count One. *See* ECF No. 184 at PageID #: 5953. Therefore, judgment will be entered in favor of the Chesapeake Defendants on this alternative breach of contract claim.

## VI. Conclusion

Viewing all facts and reasonable inferences in the light most favorable to the nonmoving party, Defendant Total E&P USA, Inc.'s Motion for Summary Judgment (ECF No. 177) and Defendants Chesapeake Exploration, L.L.C., Chesapeake Operating, L.L.C., and CHK Utica, L.L.C.'s Motion for Summary Judgment (ECF No. 179) are granted and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 168) is denied.

Final judgment will be entered in favor of Defendants and against the Class on Counts One (breach of contract) and Three (breach of the express covenant to "act as a reasonable

(4:15CV2449)

prudent operator exercising good faith") of the Class Action Complaint (ECF No. 1-1 at PageID #: 14-168).


      IT IS SO ORDERED.


   March 30, 2020                            */s/ Benita Y. Pearson*
Date                                      Benita Y. Pearson
                                            United States District Judge